Today's cases will be called, as previously announced, the times will be as allotted to counsel. The first case today is No. 23-2074, United States v. Furman Castillo. At this time, would counsel for the appellant please come up to the podium and introduce himself on the record to begin. Michael Pavian on behalf of Furman Castillo. Before I begin, I'd like to reserve two minutes of my time for rebuttal. You may. May it please the Court. Furman Castillo is currently serving a 25-year sentence as a result of a trial that the government does not dispute was riddled with errors. Those errors were neither isolated nor peripheral. They went to the heart of the prosecution's case, representing an inappropriate attempt to corroborate the otherwise highly suspect testimony of cooperating co-defendant Cesar Castro. It bears repeating that, contrary to what the government told Castillo's jury in its opening statement, investigators had not observed Castillo engaging in any drug distribution or money laundering during the charged time period, and only Castro, an admitted drug dealer testifying against Castillo in hopes of avoiding a potential life sentence, could identify Castillo's voice on recorded calls. The government made many misstatements to the jury in opening and closing statements. Can I ask you this question in terms of your sentencing disparity argument? Yes, Your Honor. Setting aside that Castro pled guilty and testified, which might make him different from your client, setting that aside, are the two really apples to apples, and what is the evidence at trial that you would cite to that suggests that? Because when I look at the trial transcript, it looks to me like they were actually different types of actors as well. Yes, Your Honor. I think that no two defendants are completely alike, and certainly there are some differences that the government or the district court could have pointed to below. But there was also substantial support in the record we cited in our supplemental brief for the proposition that Castro and Castillo were essentially alleged to be partners. In fact, that's what Castro said on the stand. He said it was both of our business. We were partners. He also said that once Castillo was in Mexico, I was the one in charge. And while the government certainly alleged that Castillo may have been more culpable, many of those allegations are predicated upon the very unsupported assertions that we objected to at sentencing, repeating what we believe were improper themes from the opening argument regarding his alleged importation from Mexico, which was never proven. So in even setting aside whether there were or were not differences, that would be for the district court to articulate and address in the first instance. And that's what this court held in United States v. Robles-Alvarez. At the very least, Castillo raised a potentially powerful disparity argument, where there's a 260-month disparity between himself and the co-defendant that was convicted of engaging in the exact same conduct in which he testified. Counsel, how do we understand that argument, the lack of explanation argument that you're making right now, given that Castro was sentenced afterwards? And so I think as the government points out, how could the district court here have explained a disparity that hadn't taken place yet at the point that your client was sentenced? Your Honor, it's our position that the existence of a disparity was raised at Castillo's sentence. I agree. Let's assume we agree with you on that. But it was sort of a hypothetical disparity at that point. So how do you think the court – I'm just looking for your thoughts on how you think the court should be evaluating what amount of explanation a district court can give when the second defendant hasn't been sentenced yet? I understand the question, Your Honor. I think that while it was hypothetical because Castro had not been sentenced, it was not a hypothetical completely coming from left field. As we said and Castillo said in the sentencing memorandum, it was predictable given the government's position regarding Castro's cooperation that he may receive a sentence below the 10-year mandatory minimum that the government contended would otherwise apply. So while district court did not have the opportunity to, you know, go chapter and verse and say what it would have sentenced Castro to and calculate that precise disparity, we submit that there was at least a predictable enough disparity that the district court required some explanation for the differential treatment of Castillo and Castro. It's not as if new information arose before Castro's sentencing. He had cooperated. He testified at four days at Castillo's trial. And we contend that the district court had sufficient information before it. And frankly, the government had sufficient information to justify disparate treatment if they had wanted to. Castillo raised the issue twice at sentencing. The government didn't address the disparity issue at all. Neither did the district court. It never even mentioned the word disparity. So in that regard, because it was, again, raised as a predictable disparity between the two co-defendants at sentencing, we think that clearly distinguishes this court's decision in Bischoff where there's absolutely no reference to a disparity at sentencing. In that case, of course, the district court cannot be expected to sua sponte, address a disparity that the defense has not even raised at sentencing. I guess just sort of following up on Judge Rickleman's question, what would you have wanted the court to say? I think I'm going to sentence Castro differently and less, and now I'm going to explain to you not only why the sentence here is the right sentence for your client, but why it's different than a sentence I haven't given in a different case. I think, Your Honor, the court could have and was obligated to explain why it did or did not view Castro as a fair comparator here for purposes of Section 3553A and the provision warning against unwarranted disparities. It could have either said, yes, I agree with you. They're similarly situated, and I'll take that into account. Or it could have said, no, for X, Y, Z reasons, I don't view Castro as a fair comparator. But what it was not entitled to do under this court's decision in Robles-Alvarez we submit was to just remain totally silent on the issue, to not address it at all. It's a factor that the court is statutorily required to consider. And requiring the district court to address a disparity for – Just out of curiosity, in the comparator sentence, was there any reference to Castillo? There was not, Your Honor. And it's not in – You have many, many, many arguments, and some go to the conviction itself. On the confrontation clause and the issue concerning Marr, can you help me understand how we're supposed to think about that question? In this case, since there is an instruction telling the jury not to consider it for the truth, correct? Your Honor, I'm not sure exactly what issue you're referring to. This is the question where all of the evidence is put forward. Am I misunderstanding? Maybe I'm off the tick. Never mind. Go ahead. Okay. One last point on the disparity issue, and then I do want to address the convictions, is that what we're asking this court to do, which is to hold that the district court was required to in some way address a disparity that had not come to fruition, is not unprecedented. In fact, in the United States v. Penise, the Seventh Circuit vacated a sentence based in part on – Before you go back on the conviction, though, on the instruction regarding the interstate commerce, could you just respond to their contention there's no prejudice from it? Yes, Your Honor. We disagree with that for substantially the reasons we've stated in our brief, which is that there was no competent evidence that the money traveled interstate at all or that there was even any activity interstate. These are evidence – Counsel, what's your basis for saying that? Because I apologize, I'm not remembering which of the government officials, which of the officers testified to this, but one, I think maybe it was Hernandez, said that in fact the buys that were happening, they were able to trace the eventual money to landing in Mexico. So I – So how are you – how can you say that there was no evidence that the money went? I believe the way I phrased it was no competent evidence, and I think I have two responses to Your Honor's question. The first is that those three deliveries, that there was testimony that they were paid out in Mexico, were three other deliveries, three different deliveries than the three that Castro got on the stand and connected to Mr. Castillo. Secondly, we've challenged the – Why do they need to be the same? Why does that make Officer Hernandez's testimony not competent? Well, the fact – I think that makes it not sufficient proof to prove that Castillo's offense had an effect on interstate commerce. The reason it's not competent we submit is different. It's that Officer Hernandez got on the stand. He didn't say that he was involved in the wiring of these funds at all personally. He didn't explain at all what his basis and personal knowledge for the funds being paid out in Mexico was. And, in fact, contrary to this Court's precedent, he testified to the collective knowledge of investigators using the word we. Reading his testimony in context, some of the – some of his assertions regarding the money being paid out in Mexico appears to be based on statements by a non-testifying confidential informant, which raises serious issues under the confrontation clause. I'd note that the government does not defend the admissibility of that testimony at all in its brief. It simply says that it's not overview testimony. We disagree with that. We think that this Court has been very clear for the better part of 20 years that the government cannot have an investigator get on the stand and provide wide-ranging hearsay testimony regarding the collective knowledge of investigators and what they've learned. Counsel, wasn't Officer Hernandez the officer who was directly involved in the buys? I thought he was the undercover officer who was actually executing some of these buys and, therefore, was knowledgeable about the channels through which the money flowed. Yes, Your Honor, he was involved in personally picking up the money, and we're not challenging the competence of his testimony on that point. But what we're challenging is whether there was a sufficient basis laid by the government, because it's the government's obligation to lay a foundation for the testimony, that he had personal knowledge of how these funds traveled to Mexico. He never said he wired the funds. He never explained how he knew he wired the funds other than to say we wired the funds, which, again, this Court in its Vasquez decision cited in our brief has said that investigators cannot testify with that collective we reflecting hearsay statements from other investigators. But if he's one of the people in the we, does that change things? I don't think it does, Your Honor, because it's not clear that he's testifying from personal knowledge. In fact, the implication as I read the testimony is that— And what's the import of—aren't we on plain error for this question? For this particular issue, yes, though there is other— What's the import of what you say is not clear for purposes of it being a plain error? Well, Your Honor, it was undisputed in this case that Castillo was living in Mexico during this charge conspiracy. He was living there with his girlfriend was the testimony. The government repeatedly in opening statements and in closing statements tries to connect the drugs and the money to Mexico, which naturally in this case mattered because the government could use Castillo's undisputed presence in that location coupled with the source of the drugs allegedly being from Mexico and the payments allegedly going to Mexico to make it— to argue to the jury that it was more likely that he was involved. And we submit that that's precisely what it did. I'd also like to address the issue of prosecutorial misconduct in closing statements. I don't think you quite answered my question about prejudice. Burden is on you for prejudice for plain error, correct? Yes, Your Honor. And I think it was—I think there's a reasonable probability that there would have been a different result given Castillo's presence in Mexico and this inadmissible evidence, which again the government doesn't defend the admissibility of the evidence, tying the funds to Mexico. That tends—has had a reasonable probability of connecting Castillo to this alleged offense. And for all the reasons set forth in our brief, this is not a case of overwhelming evidence. I want to jump to the—I think you've answered that question, but I don't want you to jump into the misconduct. It's fine, Your Honor. I'd like to go to the pen—the—sorry, the pen register data. Yes, Your Honor. So one quick question is I think in your brief you say it's clear that that exhibit was altered by somebody, that a person— The summary exhibits. Yes, Your Honor. Yes. Can you just explain that? Yes, Your Honor. I think what I said is there's no apparent explanation other than human intervention for these summary exhibits because what we have here are two sets of pen register data, Exhibits 206 and 210. The government has its agent come in and get up and testify that the summary exhibits, 206.1, 206.2, 210.1, 210.2, were quote-unquote subsets of those original sets of pen register data. Well, it turns out, and the government does not dispute, that those purported subsets contain data that is not reflected anywhere in the underlying exhibits. So we submit that it's simply— there's no apparent explanation that I can see for how those summary exhibits are created other than someone sitting down taking data, some data from Exhibits 206 and 210, other data from other places and putting them together. Regarding prejudice on this issue, didn't the jury have sufficient evidence of at least corroborating evidence of that data from Castro's testimony? Your Honor, the government relies heavily on Castro for corroboration. We don't raise a sufficiency of the evidence challenge here. We understand that a cooperating co-defendant's testimony is minimally sufficient to support a conviction, or maybe. But the jury was not required to believe Castro, right? So his testimony was suspect as the district court instructed the jury. And we think that it's far from clear that the jury would have credited Castro's testimony absent all of the improper corroboration and improper statements that we've cited in our briefing. Okay, but absent specifically the pen register data, you think that was enough? Yes, Your Honor. The government's leading argument in closing was, look at these four numbers. These four numbers directly tie Ferman Castillo to these charged offenses. And then a couple pages later, it gets to Castro's testimony, and it says, we're not asking you to take Castro at his word. Look at this corroboration specifically citing the pen register data. The government came back to that pen register data time and time again, as we've cited in the briefs, and we submit that the government certainly has not proven harmlessness here. Unless the Court has any further questions, I'll rest until rebuttal. Thank you. Thank you, Counsel. At this time, would Counsel to the United States please introduce himself on the record to begin? Good morning, Chief Judge Farinan. May it please the Court, Mark Quinlivan on behalf of the United States. Let me take the arguments in the order in which they were addressed this morning. I'm quick because I want to close the door quickly on the sentencing disparity argument. For two separate and independent reasons, which were apparent on the record at the time of the defendant's sentencing, Mr. Castro and the defendant were not similarly situated. Number one, defendant, as is his right, went to trial. Mr. Castro pled guilty pursuant to a plea agreement with the government. This Court has said on numerous occasions, that's enough to dispel any apples-to-apples comparison. Number two, Mr. Castro testified at the defendant and Mr. O'Rourke's trial. Indeed, over the course of four different trial dates. That is another difference. Number three, the defendant was subject to a heightened mandatory minimum sentence by virtue of his prior federal conviction for trafficking in cocaine, which was not the case with respect to Mr. Castro. So there was no apples-to-apples comparison. The second reason, and the Court has noted this, is that Mr. Castro was sentenced more than six months after the defendant. Now that's significant because, and this Court can see from the record, Mr. Castro's PSR wasn't even prepared until January of 2024, after the defendant's sentencing in November 28th of 2023. So at the time of the defendant's sentencing, the District Court did not have the PSR. It did not have the party's sentencing memorandum with respect to Mr. Castro. It had not heard the party's sentencing arguments. What do you think a District Court is supposed to do when faced with a disparity challenge? In other words, there's co-defendants. One is going to be sentenced later. Let's take away what you claim are sort of on-the-face reasons for not to be concerned with the disparity. The second person is going to be sentenced later, so no PSR. We don't know what's going to happen. What is, do you think, the advisable thing for a District Court to do? It would seem strange if the right thing to do is just not mention the disparity argument, pretend it wasn't made. So what should the District Court do in reference to a contention that, well, you've got two people. It's going to be problematic if you give one ten times the other, and it shouldn't be my guy who gets the ten times. I'll give you a more formal answer and a more practical answer. The most formal answer is what this Court said in Bischoff, and this Court cited the Eighth Circuit's decision, and I think it was McConnell, which made the same point, which is I think the terms used by the Eighth Circuit is sentencing judges are mere mortals. They can't be expected to anticipate what happens in the future. So what this Court said in Bischoff is at the time of the defendant's sentencing, in that case, there was no disparity to consider or justify. So that's the more formal answer. The more practical answer, I would say, is I think it would be, a judge would be ill-advised to say anything more than whether or not there was some obvious difference on the record, because again, the judge hasn't, even in a situation in which the judge, for example, let's say the co-defendant is being sentenced the next day. So at that point, the judge has the PSR, has the party's sentencing memorandum, but the judge hasn't heard the party's sentencing arguments, and more importantly, the judge hasn't heard the defendant or the co-defendant's allocution. So I think a judge would be ill-advised to say anything more than just what might be apparent on the record. Counsel, do you think that's true even when, as opposing counsel argues, it seems likely that the co-defendant is going to receive a sentence below 10 years that's been requested? Of course, the district court doesn't have all the facts, as you've said, but should the district court at least discuss why, if he's just sentenced someone to 25 years, the possibility of a sentence under 10 years for a co-defendant who testified that they were similarly culpable would make sense? I mean, should the district court at least do that? I understand your point that they can't go into detail. Absolutely, Judge. I would say this. I think a district court can do that, but I don't think a district court is obligated to do that, nor do I think this court should impose any kind of rule, because I think that would be inherently problematic for all the reasons I've set forth. It would put the judge in the untenable decision of trying to figure out what can I say and how do I not create a potential procedural error in the sentencing of the defendant that's to come in the future. So, in your view, essentially, we can only review for substantive reasonableness in these sorts of situations? Yes. Whether this, and I know disparity is sometimes viewed both as a claim of procedural and substantive reasonableness, but for all intents and purposes, it fails on the same basis. But it is a very large disparity here, so looking at it from a substantive reasonableness standpoint, again, you've noted the reasons why they're different, but then your opposing counsel points out that, you know, they're also the same in lots of ways in terms of actual culpability. Castro testified that they had a similar role. They were partners. And this is a tremendous disparity, much bigger than we've seen in our other cases. What's the government's response? I think that our response is, number one, this Court has, in its prior cases, essentially said that a sentencing disparity claim under substantive reasonableness fails for the same reason it would fail under procedural reasonableness. And I would say as well that there's no dispute that it is a large disparity, but there is a huge disparity between the defendant and Mr. Castro given the fact not only did Mr. Castro plead guilty, but he testified for the government, and then we do have the additional 851, which raised the mandatory minimum sentence for the defendant, and that wasn't the case. So they were subject clearly to different sentencing ranges. In the plea agreement for Castro, was there a recommended sentence? I don't know the answer to that, Chief Judge Barron. I have not reviewed. I can't say. If I've reviewed it, I can't answer that off the top of my head. Let me go to a couple of the other points that were raised. I do want to say from the outset that we don't think that this was a trial that was riddled by error. This was a trial in which the overwhelming majority of the defendant's claims of error lack merit for the reasons that we've set forth in our brief, and while we've admitted that there were some missteps in this case, none of them were so prejudicial or so poison the well that a new trial is required. Can you specifically move to the – in my head I was calling them the prior bad acts, but it's really the 403 issue. Yes. So what was the proper non-propensity purpose for admitting the evidence of Castillo and Castro's prior drug dealings, including that instance of the delivery of the fentanyl? Yes, Judge Montecalvo, and I do think they're separate. So the broad special relevance was to establish the nature of the conspiratorial relationship between the defendant and Mr. Castro prior to the charged conspiracy to show that that relationship continued when in 2019 the defendant moved to Mexico. And this court has recognized that in multiple cases, and indeed with respect to that body of testimony, my friend has not argued that it was inadmissible under 404B. He just makes the 403 argument. On the more narrow issue with respect to that one fentanyl delivery, I think that that argument or that the objection was not raised to what really was the evidence that tied the defendant in any way to the delivery. So what happened was there was the agent, Trooper Simkins, testified that there was a delivery of fentanyl made from somebody driving a Honda Crosstour. There was an objection. The district court asked him how he knew that it was a delivery of fentanyl, and the Trooper Simkins said, because I was there. And he said, were you working with the undercover informant? And he said he was. And so the district court allowed the testimony to go forward. And then the prosecutor asked, did you begin an investigation? Yes. Into whom? Fermin Castillo. No objection was raised to that testimony. So on plain error review, I don't think that the defendant can show that there was a clear or obvious error in admitting that testimony, and that's only underscored by the fact that the district court gave a limiting instruction about the testimony in this case that predated the conspiracy. The district court. But wasn't the limiting instruction not particularly helpful? I mean, in opposing counsel's view, he argues that it says that you could consider it in any way you want to consider it, but you just have to consider it for the time period of the charge. Yes. I mean, I'll concede. It may have not been the model of clarity, but the district court did instruct the jury that I've allowed this testimony and you can draw whatever inferences you can from it, but it has no relevance to whether or not they're guilty for, and I'm paraphrasing, you can't consider it or it doesn't bear on whether or not they're guilty in the charged conspiracy. I don't think it said that, though, counsel, did it? That you can't consider it for. I think he kind of said the opposite is the problem. It said you can consider it for whatever it's worth, you just have to consider it for the appropriate time period of the charge. Isn't your position that they could consider it? They could. For the guilt? No, no, no, not. Well, in the sense that you were saying that it's evidence that shows the conspiracy continued. Well, it's evidence that has special relevance to show the background of the conspiracy leading up to the main thing. So that you could draw an inference that the conspiracy continued. So, I mean, it is being used for the purpose of the guilt. It would be strange to say here's some evidence you can't look at for the conviction. Why is it in? Fair enough, but I would note that, you know, there was no objection to that instruction as well on that ground. So, again, you know, the defendant has to surmount the plain error bar with respect to that instruction and then surmount the plain error bar bringing that into this claim. So I don't think that the prior BAD Act's testimony that that claim has any merit. On the Penn Register, Penn Register data just simply isn't hearsay at all for the reasons we set forth in our brief. And with respect to this- What's the main case you rely on for that? I know you cited some cases in your brief, but I just- So the Penn Register Act was enacted in 1986. In the 38 years, so if you do a Westlaw search of Penn Register say within 25 hearsay, you're only going to come up with two unpublished decisions. One, which is cited in my friend's brief, is the Fifth Circuit's unpublished decision in the United States v. Robles where they found that it was admissible under the business records exception, but didn't consider the threshold question whether it was hearsay at all. The second decision, and I'll provide the citation in a letter, is United States v. Walt. It's an unpublished decision from the Ninth Circuit from 1997. And the Ninth Circuit in that case says it's not clear to us that this is hearsay at all, but assuming it is, it was admissible under the business records exception. The citation, I think it's 117 Federal Reporter 3rd, 1427. So I think I don't have a case for that, but I think the very absence of cases demonstrates the common understanding that Penn Register data is not hearsay. It's not the statement of a person. It's simply data collected by devices. And that's exactly what the statutory definition of a Penn Register is in the Penn Register Act. I think then Casillo makes an argument, and he mentions it at oral argument, that at least the summaries appear to be not just machine data, but something that was manipulated. Right. And those are admissible as summaries of voluminous materials under Rule 1006. And the other materials, I mean, no objection, no specific objection was raised on this ground, but I think the answer is it was simply other Penn Register data that was included in those summaries. And I don't think, I mean, my friend has not made any argument as to why the inclusion of that additional material somehow prejudiced him. So for all those reasons, the Penn Register claim, I think, falls away as well. On the failure to instruct about the interstate commerce, we do acknowledge that was a clear, obvious error for the district court. But the record at the trial shows that there was ample evidence that, from which a jury could find that that element had been shown. And this court said in Owens that the failure to properly instruct about the money laundering statutes, the interstate commerce element, can fail on plain error review for that same reason. And I will point, it was Detective Hernandez who testified that he made four as an undercover. After communicating with Mr. Castro, he picked up four money drops, and then that was wired to money brokers, two of whom were in Colombia, and the first three of those were then paid out in Mexico. My friend has argued that that testimony shouldn't have come in, but again, he makes that argument under the umbrella of overview testimony. Detective Hernandez in no circumstance can be viewed as an overview witness. He testified at the end of the government's case. He wasn't mapping out the entirety of the government's case. He wasn't setting out the roles of the individual defendants in the conspiracy. That's just worlds apart from overview testimony, which this court has held is when the government's first or one of the first witnesses, an undercover agent purports to set out the sort of universal knowledge of the investigators. To some extent, these challenges are nested, and so I don't recall how we handle when we're trying to assess the quantum of evidence that might overwhelm a claim of prejudice under plain error. In assessing that evidence, do we do it like we do for sufficiency claims, where we just look at the evidence independent of whether it was properly admitted, or do we look at it through the lens of whether it was properly admitted to determine whether it can count in overwhelming the prejudice? Judge Barron, the only times that I've seen where it's the latter is where the court has already ruled on. So you have the threshold evidentiary claim, and the court has ruled that that could or not come in and then made the prejudice analysis potentially excluding that. What do we think we're supposed to do? Because in theory, the overview challenge could fail on prejudice grounds independently or something, and then we wouldn't have to resolve that question. But do we then have to resolve it in determining prejudice on the instructional issue? I don't think so, and I think that even if you did, all roads lead to Rome. They all do if we agree with you, but they don't if we don't. But I think at the end of the day, there could have been any number of challenges to Detective Hernandez's testimony on this one. But in the short answer, you're not quite sure what we're supposed to do in terms of whether. I'm not sure either. We've both been at this. You've been at it longer than I have. I would say my best answer is that with respect to the evidentiary claim, it fails because it's not overview testimony, and it was not challenged on separate and independent grounds. As such, when you then look at the interstate commerce claim, that evidence can be taken into account. Counsel, what was the foundation for Detective Hernandez's testimony about what happened to the money, the actual train of money? Was there a foundation laid for how he knew where everything went? I don't believe Judge Rickleman that he explained at each step. What he did testify to is the individual steps that were made with respect to the four transactions, that the first two were paid out to money brokers in Colombia, or that they were wired to money brokers in Colombia and then paid out in Mexico. The third was wired. He didn't identify who it was wired to and then paid out in Mexico. And then the fourth was wired to the Chicago field office to then be distributed. So I think that was the testimony that came in, and I don't believe there was an objection to that testimony on foundational grounds. Thank you.  Thank you, counsel. At this time, counsel, for the appellant, please reintroduce himself on the record to begin. He has a two-minute rebuttal. Michael Pavian on behalf of Furman Castillo. First, regarding the point about a sentencing disparity, the government relies on the fact of Castro's guilty plea in cooperation, but that's no different from this Court's opinion in Robles-Alvarez, where the comparator also pled guilty, cooperated. The mandatory minimum that the government cites was purely an exercise of prosecutorial discretion. Castro, like Castillo, had a prior conviction that could have supported an enhancement on that basis. The only thing about this case that's different than Robles-Alvarez is the timing, and we submit that the government shouldn't be able to essentially avoid any consequence of a potential sentencing disparity by repeatedly delaying the cooperating co-defendant's sentencing, as occurred here. Now, with regard to the 404B issue, and particularly its sample delivery, the only purpose that the government cites is to say no permissible purpose below. Here, it relies on testimony to explain the start of the investigation, but that's not how the government used that evidence in its closing argument, as we cited in our brief. The limiting instruction provided no case-specific guidance for the jury's use of the evidence, as this Court required in Garcia-Sierra. And, in fact, the Court said, quote, draw whatever conclusions you want from it, end quote, during the charge time period. As the Court held in Garcia-Sierra, no specific objection to the limited instruction was required to preserve the evidentiary issue, which we say is preserved for all the reasons cited in our brief. Regarding the pen register data, the government never explains where this data in the summary documents comes from. It certainly did not come from Exhibits 206, Exhibits 210, or any other of the trial evidence. And for prejudice, we did cite in our brief the way that the government specifically used, not just generally used the pen register data, but it specifically used this data that was included in the summaries but not included in the larger exhibits in its closing argument. Now, lastly, on the Court's question regarding harmless error, this Court held in Villa Guillen, 102F4-508, that only evidence properly admitted can be considered in assessing whether an error is harmless. We submit that there's no reason that a different rule should apply under a plain error standard. Unless the Court has any questions, I'll rest on my briefs. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.